

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | CA-1:07-01665-CCK |
| | : | |
| v. | : | |
| | : | |
| JENNIFER G. BARBOUR, ET AL., | : | |
| | : | |
| Defendants. | : | |

---

**JOINT OPPOSITION OF DEFENDANT JULIE LEE**
**AND DEFENDANT CAROLYN STEPTOE TO**
**PLAINTIFF'S MOTION FOR ATTORNEY FEES[1]**

Defendant Julie Lee and Defendant Carolyn Steptoe ("Defendants Steptoe")

oppose Plaintiff Metropolitan Life Insurance Company's Petition for Award of

Attorneys' Fees and Costs (the "Petition"), and asks this Court to deny the Petition. The

Petition should be denied for the reasons set forth below.

**I.    Defendant's Request for Attorney Fees is Untimely.**

This Court granted Plaintiff's interpleader request, and ordered the Plaintiff

dismissed from the case on May 19, 2008. The Federal Rules of Civil Procedure, Rule

54(d)(2), required the Plaintiff to file any motion for attorney fees within fourteen (14)

days of the Court's order dismissing it from the action. The Plaintiff did not file a motion

for attorney fees within fourteen (14) days and has no good excuse for not doing so; it

had experienced counsel, and the rule is clear.

---

[1]    Defendant incorporates by reference non-conflicting statements already in the record that support Defendants Steptoe's proffer of facts in this Opposition.

By waiting almost sixty (60) days to motion this Court for attorney fees and costs, the Plaintiff has prejudiced the Defendants Steptoe who would have factored such a request into their consideration of whether to appeal the Court's order. The time for noting an appeal has passed or been substantially depleted. Moreover, the defendants are moving into mediation regarding distribution of the escrowed funds and it simply is unfair and inefficient for the Plaintiff to interrupt that process with a late-filed request for attorney fees. There is no good cause to allow the Plaintiff to proceed out of time (*see* also discussions below).

## II.    Attorney Fees and Costs May Not be Awarded to Plaintiff Seeking Interpleader Relief.

There is no statutory authority to support the award of attorney fees and costs for a Plaintiff seeking interpleader relief and, thus, an award of attorney fees would be improper. Minnesota Mutual Life Insurance Company, 415 F. Supp. 615, 619, n.4 (N.D. Minn. 1976). In fact, the prevailing authority in this jurisdiction is that the Plaintiff seeking interpleader relief is not entitled to attorney fees. Continental Trust Co. v. Corbin et al., 80 F. Supp. 394 (D.C.D.C. 1924).

> "The plaintiff, in such a case as the present, does not raise the fund by his diligence, nor does counsel bring it into court from some other source for the benefit of the parties called on to interplead. On the contrary, the fund is admitted to belong to the one or the other of the parties [sic] defendant, or both, and the payment of it would seem to be no more than the duty of the plaintiff. The decree sought by the plaintiff in interpleader is for his own benefit and protection."

Continental Trust Co. *citing* Helmken v. Meyer, 118 Ga. 657, 663, 45 S.E. 450, 452. Continental Trust is in line with authority from other jurisdictions that either does not allow attorney fees and costs for interpleader actions, or allows them only when the

2

Plaintiff has proceeded in good faith, is a disinterested stakeholder, or did nothing to cause or contribute to the litigation (see discussion below of Plaintiff's misconduct and/or negligence that resulted in the bringing of the action) or improperly incite the challenges to it. See, Travelers Indemnity Company v. Israel, 354 F.2d 488 (2d Cir. 1965); Companion Life Insurance Company v. Schaffer, 442 F. Supp. 826 (S.D.N.Y. 1977); Minnesota Mutual Life Insurance Company at 618-619 (N.D. Minn. 1976); Unum Life Insurance Company v. Kelling (citation omitted/Tennessee District Court case); Watson Seafood v. Poultry Company, Inc. ID #56-0576172, Debtor, 66 B.R. 635 (B.R. E.D. N.Car. 1986).

III.    **The Plaintiff Should Not be Awarded Attorney Fees Because It Did Not Proceed in Good Faith/With Clean Hands, Was Not a Disinterested Stakeholder, and Behaved Improperly when it Reversed its Decision to Pay Defendant in the Order of Precedence and Moved for Interpleader Relief Instead.**

The Plaintiff relies on authority from outside this jurisdiction to support its claim that the award of attorney fees is allowed in interpleader actions.   The prevailing authority in this jurisdiction is to the contrary.   Notwithstanding this, the very authority upon which the Plaintiff relies (as well as additional persuasive authority) provides an alternate basis for the Court to deny Plaintiff's request for attorney fees and costs: namely, the Plaintiff was not proceeding in good faith/with clean hands when it sought interpleader relief, the Plaintiff was not a disinterested stakeholder, and the Plaintiff behaved improperly when it reversed its decision to pay Defendants Steptoe in the order of precedence[2] and moved for interpleader relief instead.

---

[2]    The order of precedence would have allowed equal distribution of Julia Watson Barbour's insurance proceeds to all her children.

When Plaintiff denied Jennifer Barbour's ("Barbour") claim for 100 percent of Julia Watson Rhines Steptoe Barbour's ("Julia Watson Barbour") insurance proceeds in February 2008, Plaintiff did so without the knowledge, input or interference of the Defendants Steptoe. The Defendants Steptoe were not a party to the dispute between Barbour and the insurance company, knew nothing about the dispute between Barbour and the insurance company, and had not filed a claim. In fact, no person other than asserted a right to the proceeds in February, 2008.

The Plaintiff stated, and took the public position, that it denied Jennifer Barbour's claim because she was the designated "trustee" in Julia Watson Barbour's most recent designation[3] and no trust was ever set up.[4] However, at the time it denied Jennifer Barbour's claim, the Plaintiff also was aware of another infirmity associated with the beneficiary designation; Mary Lomax (Lomax), the government[5] official who signed each designation, also signed each designation twice as the "witnesses(s)" to Julia Watson Barbour's alleged designations.

The Plaintiff knew that Lomax' conduct violated FEGLIA and rendered both beneficiary designations void (citations omitted).[6] Either or both infirmities gave Plaintiff sufficient justification to deny Barbour's claims and pay in the order of

---

[3]    The Plaintiff had two separate beneficiary designations from Julia Watson Barbour. Defendants Steptoe are unable to say, on the instant record, whether the designations are authentic designations by Julia Barbour. Contrary to assertions of siblings, Defendants Steptoe asserts that their Mother told them she was leaving her insurance proceeds to numerous of her children, including them. Julia Watson Barbour also told Defendant Lee that she had appointed Barbour to handle the insurance distribution.

[4]    By rule, the beneficiary designation is treated as void and a distribution made in the order of precedence.

[5]    The Defendant contends that the existence of an employee or agency relationship between Lomax and the Plaintiff may have been borne out through discovery. Notably, the Defendant did not deny the relationship in its submissions to the Court, but expressly declined to state the nature of the relationship.

[6]    The Defendant offered the infirmity as a basis for the Court to deny Plaintiff's Motion for Interpleader relief. The Defendant and this Court reasonably would be hesitant to rely on a beneficiary designation prepared in such flagrant violation rules of designed to protect against fraudulent or coercive designations especially where, as here, the employee violating the rules later appears aligned with a person who is a party in interest.

4

precedence. Plaintiff's suppression of the Lomax violation, its refusal to treat the designations as void because of this violation, and its refusal to acknowledge that its decision not to pay Barbour's claim and to pay in the order of precedence was based on this violation, can only be explained by its interest in covering up Lomax'[7] actions.

After Plaintiff denied Barbour's claim allegedly because of the "trustee" issue, and wrote to her its intent to pay the proceeds in the order of precedence, Barbour presented to Plaintiff an affidavit from Lomax. Lomax (the same FEGLI and Plaintiff employee/agent who violated her fiduciary and contractual obligations to Julia Watson Barbour as they related to the beneficiary designations) offered support for Barbour's claim to 100 percent of the proceeds. The Plaintiff did not publicly acknowledge any concern over the impropriety of Lomax' behavior, although it naturally would have been concerned.[8]  Plaintiff did not reverse its decision to pay in the order of precedence at that time.

A month or so later, Defendant Barbour resistantly alerted the Defendants Steptoe to her dispute with Plaintiff and asserted that Julia Watson Barbour's beneficiary form listed her as 100 percent beneficiary. Defendants Steptoe contacted Plaintiff and were advised by Linda Rivera (and others) that Barbour was trustee and that it would pay the proceeds in the order of precedence. Rivera also told them to file a claim. With the beneficiary question already having been resolved by Plaintiff, Defendants Steptoe was not in a dispute with Barbour. Nor were Defendants Steptoe in dispute with Plaintiff. If

---

[7]    Discovery of this matter would have disclosed the close relationship generally, and in this case in particular, between employees of FEGLI and the Plaintiff. At all relevant points after Barbour's claim was filed, the two appeared to be working in concert to cover their employees' and/or agent's misconduct.

[8]    Defendants Steptoe asserts that Plaintiff's suppression of this problem also was an effort to cover up Plaintiff's increasing culpability.

Plaintiff had any concerns, they had to be Plaintiff's concern about its own culpability created by the conduct of its employees.

Defendants Steptoe filed claims in around May/June 2008, and the Plaintiff repeatedly said it would pay the claims. In or about July 2008, however, Plaintiff appeared to be resisting payment. [i] What was unknown to the Defendants Steptoe was that the Plaintiff and FEGLI were attempting to reconcile another act or allegation of employee misconduct related to the claim: namely, Barbour's allegation that Linda Rivera told her (during Barbour's effort to secure the funds for herself) to falsely represent to Plaintiff that a trust had been set up when it had not.[9]

The Defendants Steptoe contend that once FEGLI and Plaintiff officials were reconciled that Barbour twice implicated two of their employees/agents in misconduct and/or impropriety, and knowing that Lomax also improperly signed the designation forms, the Plaintiff recognized that it had placed itself in a position that it no longer could ignore or cover up. Plaintiff's actions after that were to extricate itself from liability for any decision associated with the distribution, minimize the likelihood that its employees'/agents' misconduct would be exposed, minimize the likelihood that it or FEGLI would be sued for misconduct or negligence, and shift the costs and fees of any associated litigation. Plaintiff determined its best and ultimate relief from its conduct would be to not pay any claims and move for interpleader. In doing so, it ignored its clear duty to the Defendants Steptoe to pay their lawful claims, deceived the Defendants

---

[9]        Defendants Steptoe attach Exhibit #1, July 2008 Email correspondence between FEGLI and Plaintiff employees acknowledging concerns about Barbour's allegation against Rivera and deciding, in the context of that discussion, not to pay any claims. Defendants Steptoe were not aware of this email traffic during its earlier filings, but attempted to put forth their theory of Plaintiff's misconduct with the best information they had at the time. The combination of the email, and the facts that eventually came out in the original filings, makes clearer Plaintiff's motivation for reversing its earlier decision and moving for interpleader relief.

Steptoe, and caused them severe emotion distress and other compensatory damages.[10] It

fact, the inappropriate signatures on the beneficiary designations, alone, was a basis to

void the designations and pay the Defendants Steptoe.

The following cases support Defendants Steptoe contention that the Plaintiff

should not be awarded any attorney fees because it did not proceed to interpleader in

good faith, did not have clean hands, was never a disinterested stakeholder, acted

improperly, wantonly, and recklessly in reversing its decision to pay Defendants on their

claims, and/or misled everybody (including the Court) regarding its true motivation for

its request for interpleader action. See, Travelers Indemnity Company v. Israel, 354 F.2d

488 (2d Cir. 1965); Companion Life Insurance Company v. Schaffer, 442 F. Supp. 826

(S.D. .Y. 1977); [11] Minnesota Mutual Life Insurance Company at 618-619 (N.D. Minn.

1976); Unum Life Insurance Company v. Kelling (citation omitted/Tennessee District

Court case); Watson Seafood v. Poultry Company, Inc. ID #56-0576172, Debtor, 66 B.R.

635 (B.R. E.D. N.Car. 1986).

The preceding also explains why, after deciding not to pay the claims, the

Plaintiff incited disputes among the siblings and encouraged them to push their claims;

they were seeking to create a record to support an unnecessary interpleader action. The

Defendants Steptoe, in good faith, continue to reject Plaintiff's suggestion that the

underlying issue was a routine insurance dispute between siblings with an innocent

insurance company stuck in the middle.

---

[10]    The Defendants Steptoe recognizes the Court disagreed, but had a good faith belief in these claims.
[11]    The Plaintiffs should not be allowed to siphon off the insured's insurance proceeds. Moreover, the Defendant would unfairly be shifting, again, the costs of conducting the business for which it already was paid to perform by Julia Watson Barbour to both the Courts and the Defendants. Companion Life Insurance Company v. Schaffer, 442 F.Supp 826, 829-831, contains a useful discussion of the abuse of the interpleader process by Plaintiff insurance companies trying to avoid liability for their own negligence and misconduct.

## CONCLUSION

For the preceding reasons, the Plaintiff should not get any attorney fees. The Defendants also challenge the Plaintiff's request for fees as the Plaintiff has not established that its attorneys' hourly rates are reasonable, that its costs were reasonable or necessary, or that the type and quantity of work it performed was reasonable or necessary.[12]

Respectfully submitted,

/s/ Julie Lee

Julie Lee, Esquire
Proceeding Pro Se
607 Bridle Lane
Birmingham, Alabama 35243
(205) 968-4025

Carolyn Steptoe
Proceeding Pro Se
1257 Lawrence Street, N.E.
Washington, D.C. 20017

---

[12]    The Defendant also asks the Court to find that the Plaintiff's attorney fees were substantially inflated because of its effort to hide and conceal it actions that may have been relevant to the Court's consideration of the interpleader action. A Plaintiff seeking interpleader does not stand in the same shoes as a Plaintiff in adversarial litigation. A Plaintiff seeking interpleader is asking the Court to relieve it of the cost and effort of a duty it, otherwise, would have. In so doing, the Court should expect the Plaintiff to voluntarily provide it with all information relevant to that decision and the ultimate distribution of funds. The Plaintiff in this case did not put forth all relevant information and argument to the Court.

8

## CERTIFICATE OF FILING AND SERVICE

I Hereby Certify That On This Date, July 18, 2008, *The Foregoing Joint Opposition Of Defendant Julie Lee And Defendant Carolyn Steptoe To Plaintiff's Motion For Attorney Fees* were filed, via hand delivery, with the U.S. District Court for the District of Columbia in the above-captioned case.

I further certify that a copy of both documents was served, via first class mail on the following:

Marsha S. Culler
11519 Sequoia Lane
Beltsville, MD 20705


Adam AD Barbour
901 6th Street, SW, #606
Washington, DC 20024

Jerome C. Rhines
11048 Anietem Drive
Alta Loma, CA 91737

Veronica Vera
5203 Woodlawn Place
Bellaire, TX 77401

Barry McCoy Tapp
TAPP & ASSOCIATES
14662 Cambridge Circle
Laurel, MD 20707-3733
*Attorney for Defendant Jordan Funeral*

Jacinto A. Rhines
1764 W. 24th Street
Los Angeles, CA 90018

Jennifer Barbour
901 6th Street, SW, #606
Washington, DC 20024


/s/ Julie Lee
Julie Lee, Esquire

Julie S. Lee
607 Bridle Lane
Birmingham, AL 35243

Julian P. Steptoe
3010 Wilshire Boulevard, #299
Los Angeles, CA 90010

Jesse A. Rhines
2122 Pico Boulevard, #D
Los Angeles, CA 20024

Carolyn C. Steptoe
1257 Lawrence Street, NE
Washington, DC 20017

Ronda B. Esaw, Esq.
McGuire Woods LLP
1750 Tysons Boulevard, Suite 1800
McLean, VA 22102
*Attorney for Plaintiff MetLife*

John P. Rhines
5233 N. Capitol Street, #312
Washington, DC 20011

Jamilla R. Lankford
5203 Woodlawn Place
Bellaire, TX 77401

Carolyn C. Steptoe, *Pro Se*

EXHIBIT # 1

**Healy, Kathleen C**

| | |
|---|---|
| **From:** | Lawrence, Laura J |
| **Sent:** | Monday, July 09, 2007 9:45 AM |
| **To:** | Healy, Kathleen C |
| **Subject:** | RE: Barbour |

Not that I know of.  I remember him saying how expensive the technology is when I commented how impressed Sylvia and her team were when they toured the MetLife dental area, where they do tape all their dental calls.  Pete commented something like he figured I'd then be insisting they tape OFEGLI calls and how expensive that would be.  But worth asking Steve next time you get the chance -- we know they don't tape 100% of OFEGLI calls, but do they tape any of them?


-----Original Message-----
From: Healy, Kathleen C
Sent: Monday, July 09, 2007 9:42 AM
To: Lawrence, Laura J
Subject: RE: Barbour

Pete mentioned phone slips.  Don't they also tape conversations?

-----Original Message-----
From: Lawrence, Laura J
Sent: Friday, July 06, 2007 5:43 PM
To: Healy, Kathleen C
Subject: Fw: Barbour



----- Original Message -----
From: pschwarz@metlife.com <pschwarz@metlife.com>
To: Lawrence, Laura J
Sent: Fri Jul 06 17:24:03 2007
Subject: Re: Barbour

Yes, she told us that also. We don't have any record of that on our phone slips of this comment and this would be something that she and other CSAs would want a record of.  We also spoke to Linda and she denies saying this.

Talk to you Monday.


----- Original Message -----
From: "Lawrence, Laura J" [Laura.Lawrence@opm.gov]
Sent: 07/06/2007 05:09 PM AST
To: Pete Schwarz
Subject: RE: Barbour



Nah, let's wait until Monday.    Thx.



What I did not like to hear though was that a Ms. Rivera at OFEGLI (I'm told anyway) told

1

████ that if she sent in a form saying there wasn't a trust that she would be paid 100% of the proceeds.  Hope that isn't true.


-----Original Message-----
From: pschwarz@metlife.com [mailto:pschwarz@metlife.com]
Sent: Friday, July 06, 2007 4:57 PM
To: Lawrence, Laura J
Subject: Re: Barbour


Sorry. I can give you a call now to discuss if you want.

_____

    ----- Original Message -----
    From: "Lawrence, Laura J" [Laura.Lawrence@opm.gov]
    Sent: 07/06/2007 04:39 PM AST
    To: Pete Schwarz
    Cc: Healy, Kathleen C" <Kathleen.Healy@opm.gov>
    Subject: Barbour


Just got off a call that lasted perhaps 45 minutes, with ███████████████


***Please do NOT YET make any payments on this case.  I will call you on Monday to discuss.


You haven't heard from 2 children. I'm told that ████████████████████. ██████ finds this all to be a headache and hasn't decided if he will claim or disclaim.


███████ is understandably very upset.  She said that Mary Lomax counseled her mother to put the word trustee "just in case" she ever did a trust.  She said that never was her mother told that if she did NOT establish a trust, that designation would be meaningless and the money would go via the order of precedence.  ████████████ understandably cannot believe that her mother would never have been given the opportunity to perfect the designation; she trusted her personnel office to tell her the correct thing to do.  Had she known that what Ms. Lomax told her was false, she would have done another designation. She continues to believe that her mother's wishes are being ignored and that her mother made every effort to do the "right" thing by consulting Ms. Lomax and following her instructions to the letter.  She remembers that the word trustee was discussed at length. No one told her mother that the use of the word trustee would in effect mean that all the children would get the money.


Re the releases.   I'm told the 6 children are not comfortable signing something so vague that says "I absolve MetLife of all obligations concerning my portion of this money" and would like to simply sign a statement that says pay my share to ███████.  Is that possible?


There is more, but better on the phone than in an email.


██████ and I will be speaking again on Monday morning, sometime after 10 am.

2

*Exemption 6 Privacy*

The information contained in this message may be CONFIDENTIAL and is for the intended addressee only. Any unauthorized use, dissemination of the information, or copying of this message is prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

The information contained in this message may be CONFIDENTIAL and is for the intended addressee only. Any unauthorized use, dissemination of the information, or copying of this message is prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

EXHIBIT # 1

Healy, Kathleen C

| | |
|---|---|
| **From:** | Lawrence, Laura J |
| **Sent:** | Monday, July 09, 2007 9:45 AM |
| **To:** | Healy, Kathleen C |
| **Subject:** | RE: Barbour |

Not that I know of.  I remember him saying how expensive the technology is when I
commented how impressed Sylvia and her team were when they toured the MetLife dental area,
where they do tape all their dental calls.  Pete commented something like he figured I'd
then be insisting they tape OFEGLI calls and how expensive that would be.  But worth
asking Steve next time you get the chance -- we know they don't tape 100% of OFEGLI calls,
but do they tape any of them?


-----Original Message-----
From: Healy, Kathleen C
Sent: Monday, July 09, 2007 9:42 AM
To: Lawrence, Laura J
Subject: RE: Barbour

Pete mentioned phone slips.  Don't they also tape conversations?

-----Original Message-----
From: Lawrence, Laura J
Sent: Friday, July 06, 2007 5:43 PM
To: Healy, Kathleen C
Subject: Fw: Barbour



----- Original Message -----
From: pschwarz@metlife.com <pschwarz@metlife.com>
To: Lawrence, Laura J
Sent: Fri Jul 06 17:24:03 2007
Subject: Re: Barbour

Yes, she told us that also. We don't have any record of that on our phone slips of this
comment and this would be something that she and other CSAs would want a record of.  We
also spoke to Linda and she denies saying this.

Talk to you Monday.



----- Original Message -----
From: "Lawrence, Laura J" [Laura.Lawrence@opm.gov]
Sent: 07/06/2007 05:09 PM AST
To: Pete Schwarz
Subject: RE: Barbour



Nah, let's wait until Monday.    Thx.


What I did not like to hear though was that a Ms. Rivera at OFEGLI (I'm told anyway) told

1

██████ that if she sent in a form saying there wasn't a trust that she would be paid 100%
of the proceeds.  Hope that isn't true.


-----Original Message-----
From: pschwarz@metlife.com [mailto:pschwarz@metlife.com]
Sent: Friday, July 06, 2007 4:57 PM
To: Lawrence, Laura J
Subject: Re: Barbour


Sorry. I can give you a call now to discuss if you want.


   ----- Original Message -----
   From: "Lawrence, Laura J" [Laura.Lawrence@opm.gov]
   Sent: 07/06/2007 04:39 PM AST
   To: Pete Schwarz
   Cc: Healy, Kathleen C" <Kathleen.Healy@opm.gov>
   Subject: Barbour


Just got off a call that lasted perhaps 45 minutes, with ████████████████


***Please do NOT YET make any payments on this case.  I will call you on Monday to
discuss.


You haven't heard from 2 children. I'm told that ██████████████████████ finds this
██████████████████ all to be a headache and hasn't decided if he will claim or disclaim.


████████████ is understandably very upset.  She said that Mary Lomax counseled her mother
to put the word trustee "just in case" she ever did a trust.  She said that never was her
mother told that if she did NOT establish a trust, that designation would be meaningless
and the money would go via the order of precedence.  ████████████ understandably cannot
believe that her mother would never have been given the opportunity to perfect the
designation; she trusted her personnel office to tell her the correct thing to do.  Had
she known that what Ms. Lomax told her was false, she would have done another designation.
She continues to believe that her mother's wishes are being ignored and that her mother
made every effort to do the "right" thing by consulting Ms. Lomax and following her
instructions to the letter.  She remembers that the word trustee was discussed at length.
No one told her mother that the use of the word trustee would in effect mean that all the
children would get the money.


Re the releases.   I'm told the 6 children are not comfortable signing something so vague
that says "I absolve MetLife of all obligations concerning my portion of this money" and
would like to simply sign a statement that says pay my share to ██████.  Is that possible?


There is more, but better on the phone than in an email.


██████ and I will be speaking again on Monday morning, sometime after 10 am.

                                        2
                                              *Exemption 6 Privacy*

The information contained in this message may be CONFIDENTIAL and is for the intended addressee only. Any unauthorized use, dissemination of the information, or copying of this message is prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

The information contained in this message may be CONFIDENTIAL and is for the intended addressee only. Any unauthorized use, dissemination of the information, or copying of this message is prohibited. If you are not the intended addressee, please notify the sender immediately and delete this message.

3